UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LISA  KIRKWOOD, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-191 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM AND RECOMMENDATION**

Plaintiff Lisa Kirkwood brought this action on May 26, 2014, seeking review of the Commissioner's final decision determining she was not disabled.  (D.E. 1).  On December 31, 2014, Plaintiff filed Brief in Support of Claim.  (D.E. 14).  On February 26, 2015, Defendant filed a Responsive Brief.  (D.E. 15).  For the reasons that follow, it is respectfully recommended that the Commissioner's determination be **AFFIRMED** and Plaintiff's cause of action be **DISMISSED**.

## **I.  JURISDICTION**

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

## **II.  BACKGROUND**

Plaintiff protectively filed her applications for disability and disability insurance

benefits on November 18, 2010, alleging disability as of May 1, 2006,[1] due to fibromyalgia, left foot surgery, right should surgery, migraines, depression, post-traumatic stress syndrome, stroke, inability to control bladder, anxiety, and a lump in her left breast. (D.E. 12-6, Pages 2- 5 and D.E. 12-7, Page 17).

Plaintiff's application was denied upon initial consideration and was again denied upon reconsideration.  (D.E. 12-4, Pages 1-2 and D.E. 12-5, Pages 1-10).  At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on October 3, 2012 at which Plaintiff and a vocational expert ("VE") testified.  (D.E. 12-3, Pages 102-135 and D.E. 12-5, Pages 11 and 16-18).  The ALJ issued an unfavorable decision on December 7, 2012, finding Plaintiff not disabled.  (D.E. 12-3, Pages 86-101).  Plaintiff requested the Appeals Council review the ALJ's decision, and the Appeals Council denied her request for review on March 26, 2014, making the ALJ's determination the final decision of the Commissioner under 42 U.S.C. § 405(g).  (D.E. 12-3, Pages 2-5).  Plaintiff timely filed this action on May 26, 2014, seeking a review of the Commissioner's final decision.  (D.E. 1).

## III.  SUMMARY OF THE EVIDENCE

The undersigned has reviewed all of Plaintiff's treatment notes in the record. However, only those relevant to the pending issues raised are included below.  Plaintiff, at the time her application was filed, was a 42 year old woman with two years of college education and past relevant work as a store clerk and shoe stitcher.  (D.E. 12-7, Page 18).

---

[1]Plaintiff later amended her alleged onset date to January 1, 2010.  (D.E. 12-3, Page 108 and D.E. 14, Pages 1-2).

Plaintiff reported she stopped working on December 31, 2009 because of her ailments. (D.E. 12-7, Pages 17).

Prior to 2007, Plaintiff is noted on several occasions as having and being treated for migraines and tension headaches and having PTSD screenings and symptoms.  (D.E. 12-8, Pages 22, 24-25, and 114; D.E. 12-9, Page 3; D.E. 12-10, Pages 27, 30 and 31; D.E. 12-11, Page 18).  On March 31, 2003 and March 15, 2004, Plaintiff is noted as having a history of sexual harassment or rape as a civilian reporting she was molested at age seven by a family member, prior counseling did not help, but she was "doing ok now."  (D.E. 12-9, Pages 8 and 13).  On September 2, 2005, Plaintiff reported she was raped when she was 16 in Canada.  (D.E. 12-10, Page 21).

On July 20, 2005, Plaintiff reported she had pains in her right hip, both knees and both ankles.  (D.E. 12-10, Page 24).  Plaintiff reported she worked on her feet all day and by the end of the day, she was in a great deal of pain.  (D.E. 12-10, Page 24).  Plaintiff also reported her legs were stiff and painful when she first woke up in the morning.  (D.E. 12-10, Page 24).  Plaintiff reported she tried Aleve but it did not help very much and she had no weakness in her legs.  (D.E. 12-10, Page 24).  Plaintiff is noted has having a good range of motion in her hips, knees and ankles with no swelling or effusions and no tenderness in any of the muscles.  (D.E. 12-10, Page 24).  On August 9, 2005, Plaintiff was treated as a follow up for her complaints regarding her legs giving away at times as well as chronic headaches and dizzy spells.  All of the tests conducted indicated normal results, reflexes were decreased but symmetric, and heel/toe walking was normal.  (D.E. 12-10, Page 23).  Plaintiff was noted as having myalgias in the lower extremities,

uncertain etiology.  (D.E. 12-10, Pages 23 and 24).  Plaintiff was prescribed Ibuprofen 800 mg.  (D.E. 12-10, Page 24).

On May 22, 2006, Plaintiff dislocated her right shoulder trying to prevent her husband from falling during a seizure.  (D.E. 12-10, Page 19 and D.E. 12-11, Pages 12, 17 and 36).  On October 9, 2006, Plaintiff reported her house was destroyed in a fire on August 8, 2006 and her family lost everything.  (D.E. 12-10, Page 14).

On August 23, 2006, Plaintiff reported during a PTSD screening she had an experience in her life that had caused her in the previous month to be constantly on guard, watchful or easily startled and had felt numb or detached from others, activities or her surroundings.  (D.E. 12-9, Pages 5-6).  However, Plaintiff's PTSD screen is noted as "negative."  (D.E. 12-9, Page 6).  Plaintiff reported having three to four migraines a month causing her to see spots, have nausea, and light and odor sensitivity.  (D.E. 12-9, Page 5).  Plaintiff also reported she was under emotional stress, was feeling forgetful, was sleeping poorly, and was mildly depressed and anxious with financial and family stressors.  (D.E. 12-9, Page 5).

On November 15, 2006, Plaintiff reported she had been having more frequent migraines over the last six months, approximately three to five severe, mostly unilateral migraines per month accompanied by throbbing pain, flashing lights, photophobia and nausea.  (D.E. 12-8, Pages 25-26).  Plaintiff reported prior to the last six months, she had one migraine every two months.   (D.E. 12-8, Page 26).  Plaintiff was prescribed preventative medication for migraines.  (D.E. 12-8, Page 27).

On July 17, 2009, Plaintiff reported she had muscle spasms and fatigue.  (D.E. 12-10, Page 6).  Plaintiff was prescribed a muscle relaxer and ibuprofen.  (D.E. 12-10, Page 6).

On February 23, 2010, Plaintiff reported "total body aches," feeling depressed, and having had four migraines a month and chronic daily headaches.  (D.E. 12-8, Page 108-109).    Plaintiff also reported she was sedentary due to chronic pain but she did perform most household chores because she had "to look after the family."  (D.E. 12-8, Page 110).  Plaintiff was noted as appearing "not comfortable reassigning tasks to family members."  (D.E. 12-8, Page 110).  Plaintiff stated she was "sore all over," had "pain all the time everywhere in [her] body," and had very low energy and "pain…flowing through my body all the time" from chin to toes.  (D.E. 12-8, Page 110).  Plaintiff is noted as taking "massive" amounts of over the counter medications to deal with soreness.  (D.E. 12-8, Pages 110-111).  Plaintiff also noted as pleasant, interactive, neatly groomed and moving fluidly.  (D.E. 12-8, Page 111).

On April 5, 2010, Plaintiff had a rheumatology consultation where she reported slowly developing pain to touch from her neck to her toes for at least the previous year.  (D.E. 12-8, Page 12).   Plaintiff had no weakness associated with the pain and no associated triggers.  (D.E. 12-8, Page 12).   Plaintiff reported poor sleep as well as moderate stress due to her home burning down in January 2010.  (D.E. 12-8, Pages 12-13).  Plaintiff is noted as married with a 300 pound husband with chronic seizure disorder due to a military parachuting accident.  (D.E. 12-8, Page 13).   After of review of the symptoms, "[f]rom a rheumatological standpoint she is well."  (D.E. 12-8, Page 13).

Strength is noted as good with give-away weakness.  (D.E. 12-8, Page 14).  Plaintiff is noted to have "tenderness to touch over all fibromyalgia points as well as non-fibromyalgia points."  (D.E. 12-8, Page 14).  Plaintiff was assessed as having fibromyalgia, marked stress, a history of migraines and restless legs.  (D.E. 12-8, Page 14).  It was recommended that Plaintiff participate in physical therapy, start walking slowly 15 minutes a day until she could walk 30 minutes a day, take an anti-inflammatory medication, continue other current medications and consider other medications for stress, anxiety and to assist with sleep.  (D.E. 12-8, Page 14).

Also on April 5, 2010, Plaintiff complained of intermittent blurry vision in both eyes that first started six months prior, lasted up to five minutes, and went away after blinking.  (D.E. 12-8, Page 9).  Plaintiff is noted as recently being diagnosed with fibromyalgia and having a long standing history of migraines.  (D.E. 12-8, Page 9).  Plaintiff was diagnosed with dry eyes, hyperopia, and astigmatism and told to use artificial tears twice a day and to order glasses.  (D.E. 12-8, Page 10).

On April 8, 2010, Plaintiff reported she was still very stressed and anxious, had chronic poor sleep, and was concerned about the sedative effects of her medication.  (D.E. 12-8, Page 96).  Plaintiff stated she started to walk her dog but could not "currently engage in more meaningful" physical therapy.  (D.E. 12-8, Page 96).  Plaintiff is noted as having infrequent migraines.  (D.E. 12-8, Pages 96-97).  Plaintiff is also noted as pleasant, interactive, neatly groomed, moving fluidly and energetic.  (D.E. 12-8, Page 97).  Plaintiff was encouraged to walk daily and to contact her treating physician when she was ready for physical therapy.  (D.E. 12-8, Page 97).

On April 20, 2010, Plaintiff reported muscle aches and blurred vision.  (D.E. 12-8, Page 16).  Plaintiff reported her migraines began after her hysterectomy 13 years prior at age 28 in 1997.  (D.E. 12-8, Pages 17 and 45 and D.E. 12-9, Page 7).  Plaintiff further reported her husband, following his parachuting accident in 1999, continues to have three to four grand mal seizures a month and she is his caregiver.  (D.E. 12-8, Pages 17-18 and 95).  Plaintiff reported her new medication was helping her sleep better and have less anxiety.  (D.E. 12-8, Page 17).  Plaintiff was found to have frequent migraine headaches and to have "anxiety about driving and many other things."  (D.E. 12-8, Page 18).  Plaintiff is noted as alert, oriented, and cooperative.  (D.E. 12-8, Page 95).  Plaintiff further reported she and her family had moved into a new home two weeks prior, as her home had burned down at the end of January 2010.  (D.E. 12-8, Page 17).

On April 26, 2010, Plaintiff, while telephonically requesting medication refills, reported she was "doing ok on" her medication but one was making her drowsy so she reduced the dosage and was fine.  (D.E. 12-8, Page 85).

On May 14, 2010, Plaintiff reported she had been having stress as well as incontinence issues since her hysterectomy.  (D.E. 12-8, Pages 4 and 76).  Plaintiff is noted as having edometriosis, hypertension, restless legs, fibromyalgia, depressive disorder NOS, migraines, and being obese.  (D.E. 12-8, Page 5).  Plaintiff reported she stays home and takes care of her disabled husband who suffered a cervical spine injury in a parachute jump.  (D.E. 12-8, Page 6).  Plaintiff is noted as ambulatory, articulate, pleasant and in no acute distress.  (D.E. 12-8, Pages 6 and 77).  Plaintiff also reported she had not had a migraine since she began her treatment for fibromyalgia.  (D.E. 12-8, Page

80).  As to her fibromyalgia symptoms, Plaintiff is noted as "doing better" with treatment and having "mild improvement."  (D.E. 12-8, Pages 80-81).  Plaintiff is also noted as pleasant and moving fluidly.  (D.E. 12-8, Page 81).

On July 8, 2010, Plaintiff reported taking a one hour nap during the day, difficulty with sleep and stated "I hurt everywhere."  (D.E. 12-8, Page 68).  Plaintiff indicated she was interesting in counseling.  (D.E. 12-8, Page 68).  Plaintiff is noted as pleasant, interactive, neatly groomed and moving fluidly.  (D.E. 12-8, Page 70).

On July 27, 2010, Plaintiff's migraine medications were adjusted because of the high frequency of migraines.  (D.E. 12-8, Pages 49 and 66).  Plaintiff stated she had seven migraines during the previous month.  (D.E. 12-8, Page 66).  Plaintiff was prescribed a daily migraine preventative medication.  (D.E. 12-8, Pages 66-67).  Plaintiff also again reported she was her husband's primary caretaker and he continued to have three to four grand mal seizures per month.  (D.E. 12-8, Pages 66-67).

On October 1, 2010, Plaintiff is noted as having "multiple physical and emotional stressors" including fibromyalgia, caretaking for her disabled husband, general anxiety, and anxiety symptoms related to an attempted rape 20 years prior.  (D.E. 12-8, Page 53).  Plaintiff reported that since her assault, she does not like to be touched and experiences panic attacks when touched unexpectedly which had put a strain on her marriage and her relationship with her three children.  (D.E. 12-8, Page 53).  Plaintiff was referred for a mental health consultation.   (D.E. 12-8, Page 53).  The same day, Plaintiff reported she rarely drove, was thrilled with her new migraine medication because she had not had any

migraines recently, and was walking one mile a day and one mile to the store.  (D.E. 12-8, Page 56).

On October 28, 2010, Plaintiff reported her migraine medication was a "miracle pill" and she had no more headaches, had not had any headaches in 12 weeks and had lost a significant amount of weight.  (D.E. 12-8, Page 49).  Plaintiff is again noted as being the caregiver for her 100% disabled husband who continued to have three to four grand mal seizures per month.  (D.E. 12-8, Page 50).  Plaintiff is also noted as having returning memories of harassment and attempted rape for which she was seeking counseling.  (D.E. 12-8, Page 50).  Plaintiff also reported "she doesn't like to have men walking behind her."  (D.E. 12-8, Page 50).  Plaintiff stated she was driving on September 23, 2010, when her right arm fell from the steering wheel and her right face became numb.  (D.E. 12-12, Page 71).  Plaintiff stated she went to a hospital and was told she had a mild stroke.  (D.E. 12-12, Page 71).

On November 5, 2010, Plaintiff reported her fibromyalgia was "overall better when more active," she did not want to continue with physical therapy due to the costs of the co-payments, and her current medication had reduced the pain from a 10 to a 6.  (D.E. 12-8, Page 45).  Plaintiff also reported she had no migraines with her current medication and she was "thrilled with associated weight loss."  (D.E. 12-8, Page 45).

On November 16, 2010, Plaintiff was found not to have sleep apnea.  (D.E. 12-8, Page 43).  Plaintiff was given a prescription for depression and anxiety.  (D.E. 12-8, Page 43).

On November 18, 2010, Plaintiff protectively filed her applications for disability and disability insurance alleging disability as of May 1, 2006,[2] due to fibromyalgia, left foot surgery, right should surgery, migraines, depression, post- traumatic stress syndrome, stroke, inability to control bladder, anxiety, and a lump in her left breast. (D.E. 12-6, Pages 2- 5 and D.E. 12-7, Page 17).

On November 29, 2010, Plaintiff reported she likely had fibromyalgia for over 20-30 years and it seemed to get worse after her hysterectomy.  (D.E. 12-8, Page 40). Plaintiff stated she had pain "all over" in addition to chronic fatigue, non-restorative sleep, severe anxiety, restless leg syndrome, poor memory/concentration, headaches, chronic pelvic/abdominal pain, and poor overall aerobic exercise.  (D.E. 12-8, Page 40). Plaintiff further reported her migraine medications helped and she had been participating in physical therapy.  (D.E. 12-8, Page 40).  Plaintiff also reported that while she felt her functional status was declining, she continued to take care of one grandchild in addition to her husband who has serious medical issues include a chronic seizure disorder and bipolar disorder.  (D.E. 12-8, Pages 40-41).  Upon examination, Plaintiff is noted as having "diffusely positive myofascial tender points."  (D.E. 12-8, Page 41).  Plaintiff was noted as having a "a chronic pain syndrome, most likely fibromyalgia.  She has several of the associated features of this disorder…"  (D.E. 12-12, Page 63).  Plaintiff was told the "central tenants of therapy of fibromyalgia were restoration of sleep, good mood control, and regular aerobic exercise" in addition to medication.  (D.E. 12-8, Page 42).  It was

---

[2]  Plaintiff later amended her alleged onset date to January 1, 2010.  (D.E. 12-3, Page 108 and D.E. 14, Pages 1-2).

also noted that "[m]imics of chronic pain syndrome such as hypoviaminosis D versus thyroid disease should all be investigated." (D.E. 12-12, Page 63).

On January 7, 2011, Plaintiff telephonically reported she had fainted three times in the previous four days, losing consciousness for approximately three to four minutes at a time. (D.E. 12-8, Pages 36-37). Plaintiff was advised to go to the emergency room. (D.E. 12-8, Page 36).

On January 11, 2011, Plaintiff was treated in the emergency room for "episodes of passing out" for the past two to three months. (D.E. 12-11, Page 74). Plaintiff reported she felt "shaky, dizzy, nauseated, with blurry vision" before losing consciousness, her husband had to catch her to keep her from falling, she would be unresponsive for three to five minutes, and would wake and then sleep for a few hours. (D.E. 12-11, Page 74). Plaintiff reported it last occurred four days prior. (D.E. 12-11, Page 74). Plaintiff was found to have "[r]ecurrent episodes of syncope, possible seizures." (D.E. 12-11, Page 77). Plaintiff was instructed not to drive and to follow up with her primary care physician and neurologist for further workup. (D.E. 12-11, Page 77).

Also on January 11, 2011, Plaintiff completed a Social Security Administration ("SSA") Function Report, reporting she took medication which made her drowsy, had difficulty focusing and memory loss, severe pain throughout her body, could not sit for long periods of time, did not drive, had fainting spells, and some days her fibromyalgia was so severe and painful she had to stay to in bed the entire day. (D.E. 12-7, Page 25). Plaintiff further reported she helped take care of her disabled husband and her pets and, when unable to do so, her daughter would. (D.E. 12-7, Page 26). Plaintiff also stated she

was unable to sleep through the night and had difficulty falling asleep.  (D.E. 12-7, Page 26).  Plaintiff reported she prepared sandwiches and frozen dinners on a daily basis, folded laundry, swept the floor, picked up lightweight items around the house, cleaned dishes, grocery shopped once a month, was not limited in her ability to handle money except she had difficulty remembering her bills and due dates, had stopped sewing and plays bingo only once a month because of pain in her hands and difficulty sitting for long periods.  (D.E. 12-7, Pages 27-29).  Plaintiff also maintained she preferred to stay home as she did not want to be touched or hugged by people and she could walk about twenty feet before needing to rest for a few minutes.  (D.E. 12-7, Page 30).

On January 12, 2011, a treatment note indicates Plaintiff was having nearly daily episodes of altered or lost consciousness and Plaintiff had been directed to go to the emergency room.  (D.E. 12-11, Page 73).  Her treating physician noted,

> Mr. Kirwood is a 100% SC veteran.  My prior history with Ms. Kirkwood led me to believe that she is a full time caregiver for a severely physically disabled husband/vet.    Ms. Oprie [Plaintiff's treating PA] disabuses me of that misunderstanding.  Mr. Kirwood is ambulatory, fit, chops wood, and now catches Lisa as she falls.  Mr. Kirkwood has been said by Lisa to me as recently as October 21 (last visit) to be having 3-4 Grand Mal Seizures a month.  Ms. Oprie (whose patient Mr. Kirkwood is) indicates that he has ER visits that are reported as "Psuedoseizures."…[Ms. Oprie] repeatedly indicated that [Mr. Kirkwood's] disability more relates to mental health issues than to physical injury from a parachute injury.  (D.E. 12-11, Page 73).

On January 31, 2011, Plaintiff reported her previous job as a shoe stitcher required her to walk one hour a day, stand seven hours a day, handle or grasp big objects seven hours a day, reach seven hours a day, handle small objects seven hours a day, and lift at most 50 pounds and more frequently 25 pounds.  (D.E.  12-7, Pages 49-50).

On March 1, 2011, Plaintiff was noted as leaving the next day for a six week trip to Texas and the Bahamas.  (D.E. 12-11, Page 69).  Plaintiff's "recent possible seizure like activity" was also discussed.  (D.E. 12-11, Page 70).  Plaintiff reported she had an EEG last month but needed to reschedule her next neurology appointment due to her vacation.  (D.E. 12-11, Page 70).  Plaintiff further reported she had "no more spells" attributing them to her medications and to periods of intense pain and anxiety.  (D.E. 12-11, Page 70).  Plaintiff reported she was taking an extended vacation to a warmer area to see if the climate improves her fibromyalgia symptoms.  (D.E. 12-11, Page 72).  Plaintiff also reported her migraines and tension headaches were "much better."  (D.E. 12-11, Page 72).  Plaintiff is again noted as pleasant, interactive, neatly groomed, and moving fluidly.  (D.E. 12-11, Page 72).

On April 20, 2011, after her application for benefits was denied on March 11, 2011, Plaintiff completed an SSA disability appeals report stating that as of February 2011, her fibromyalgia pain had gotten worse and she had started to experience fainting spells.  (D.E. 12-7, Page 58).  Plaintiff also reported that as of March 2011, she had severe anxiety because of her pain and stress and it was difficult for her to sit, stand, type, cook or wear clothes because of her pain levels.  (D.E. 12-7, Pages 58-59).  Plaintiff stated her medications made her drowsy, tired, forgetful, dizzy, and nauseous.  (D.E. 12-7, Page 60).  Plaintiff reported she stayed close to home because she could lay down when need and would not get bumped into by people, hugged, or have to shake hands. (D.E. 12-7, Page 61).

Also on April 20, 2011, Plaintiff reported her pain as 6 out of 10 with pain "all over." (D.E. 12-11, Page 110). Plaintiff's EEG results "did not suggest an epileptic seizure disorder." (D.E. 12-11, Page 112 and D.E. 12-12, Pages 36-37). Plaintiff reported "that between January and now there have been '[a]bout a dozen' episodes in which she has 'passed out.'" (D.E. 12-11, Page 112). Plaintiff stated, while visiting her sister-in-law in Corpus Christi, TX, she "almost hit" a young man who approached her from behind while she was walking on the beach. (D.E. 12-11, Page 112). It is noted Plaintiff "probably has residual PTSD" from her assault while in the military. (D.E. 12-11, Page 112). Plaintiff further reported she had had a couple of migraine headaches and her fibromyalgia medicine forced her to sleep in the mid-afternoon and she could not sleep at night. (D.E. 12-11, Page 112). Plaintiff was referred to psychiatry for treatment of her depression and anxiety and her chronic pain from migraines and fibromyalgia. (D.E. 12-11, Page 117). On April 21, 2011, Plaintiff again reported her fibromyalgia medication caused drowsiness and she would take it only at night. (D.E. 12-12, Page 27).

On May 5, 2011, Plaintiff underwent a psychiatric evaluation. (D.E. 12-11, Pages 93-98 and Pages 100-107). Plaintiff reported "anxiety which escalates to panic symptoms when at crowded gatherings with people, especially men…including a family party on a boat, or a man coming up behind her in a grocery store." (D.E. 12-11, Page 93). Plaintiff further reported she did not go out much and stayed away from crowds because she did not like people to bump into her because it hurt. (D.E. 12-11, Page 93). Plaintiff also stated she felt worthless because she was not working, maintained her interest in her grandchildren, and was frustrated because she was 43 years old and felt

like an 88 year old.  (D.E. 12-11, Page 93).  Plaintiff stated she slept more during the day than at night because her fibromyalgia medication caused fatigue.  (D.E. 12-11, Page 93). Plaintiff further reported her panic symptoms caused her to pass out.  (D.E. 12-11, Page 94).  Plaintiff described an attempted sexual assault during her time in the military, stating she did not have nightmares about the incident but as a result did not like to be touched and avoided muscular men even in grocery store aisles, avoided crowds because she did not like people bumping into her and would start panicking and hyperventilating when people came toward her.  (D.E. 12-11, Pages 94-95).  Plaintiff was found to have poor concentration, hypervigilance describing her inability to go into wooded areas or dark places and her need to "stay out in the open," and exaggerated startle response describing panic when men would come up behind her.  (D.E. 12-11, Page 95).  Plaintiff stated her family had to move twice in the past several years because of house fires caused by electrical problems and she did not work because of her pain level.  (D.E. 12-11, Page 96).  Plaintiff reported she tried to substitute teach but could not tolerate the students bumping into her exacerbating her fibromyalgia pain.  (D.E. 12-11, Page 96). Plaintiff was noted as having "symptoms of panic, anxiety and depression" related to the attempted assault during her time in the military.  (D.E. 12-11, Pages 97 and 100). Plaintiff's symptoms are noted as "persistent" and causing "significant distress and impaired occupational and social functioning."  (D.E. 12-11, Page 97).  Plaintiff was noted as not appearing "to meet criteria for diagnosis of PTSD" at the time of the evaluation but there was sufficient evidence to endorse Plaintiff treating physician's earlier assessment of probable residual PTSD.  (D.E. 12-11, Page 97).  Plaintiff was

diagnosed with panic disorder, depressive disorder and anxiety with a GAF of 50.  (D.E.
12-11, Page 97).

On May 6, 2011, Plaintiff reported her fibromyalgia medication was effective at
night, allowing her to sleep.  (D.E. 12-11, Page 99).  Plaintiff further reported she took it
only at night because it caused drowsiness in the past.  (D.E. 12-11, Page 99).

On July 20, 2011, Plaintiff reported she was having more headaches but not
migraines.  (D.E. 12-11, Page 92).  Her medications were adjusted.  (D.E. 12-11, Page
92).  Plaintiff also reported her husband had been having five to six grand mal seizures
per month even with his medications and once he had discontinued his use of certain
medications, he had not had a seizure in four months and had lost 60 pounds.  (D.E. 12-
11, Page 92).  Plaintiff is noted as having "migraine headaches, probable post-traumatic
stress disorder related to military sexual trauma [("MST")], [and] stress related to her
husband's disability and her need to care for him." (D.E. 12-11, Page 92).  Plaintiff stated
she would be in Texas for the next five months.  (D.E. 12-11, Page 92).

On October 13, 2011, Plaintiff completed another SSA Function Report stating
that due to her fibromyalgia, she had difficulty moving, sitting, typing, writing, and
walking, had stress, difficulty concentrating, pain as well as headaches and frequent
migraines.  (D.E. 12-7, Page 64).  Plaintiff also reported her medication caused side
effects, including fainting, dizziness, blurred vision, mood swings, anxiety, confusion,
panic attacks, weakness, trouble concentrating, depression, sleeplessness, restlessness,
and sleepiness.  (D.E. 12-7, Pages 64 and 71).  Plaintiff reported she showered once a
week because the water hitting her body hurt, she did not take care of anyone else, and

her daughter took care of her.  (D.E. 12-7, Pages 65-66).  Plaintiff stated she prepared food or meals a couple of times a week including sandwiches, frozen dinners, and meals previously prepared by her daughter and that she did laundry but could not carry the laundry without her daughter's assistance.  (D.E. 12-7, Page 66).  Plaintiff also stated she did not drive, went grocery shopping once a month, felt more pain depending on the weather, was able to handle money without restriction, no longer sewed or played bingo, and did not go into crowded areas because being bumped into caused pain.  (D.E. 12-7, Pages 67-69).

On November 29, 2011, Plaintiff reported she lived with her husband, had chronic generalized pain, left shoulder pain for the past several months, occasional blurry vision and syncope, and occasional headaches.  (D.E. 12-13, Page 8).  Plaintiff reported she had a fainting spell approximately one month prior.  (D.E. 12-13, Page 9).  Plaintiff further reported her chronic pain level was acceptable and was found to be independent with activities of daily living.  (D.E. 12-13, Pages 12-13).  Plaintiff was further found to have moderate risk of falling due to her episodes of fainting.  (D.E. 12-13, Page 13).  Plaintiff was assessed as having migraine headaches which were stable on her current medication, fibromyalgia, transient ischemic attack, obesity, hypertension, left shoulder pain and PTSD/anxiety.  (D.E. 12-13, Page 9).  Plaintiff was also found to have depression.  (D.E. 12-13, Page 14).  Plaintiff reported being constantly on guard, watchful or easily startled, however, Plaintiff's PTSD screening test was negative.  (D.E. 12-13, Pages 9-10).

On December 6, 2011, a Disability Field Office Report indicated Plaintiff reported no change in her conditions, no additional ailments, and the same medication side effects as previously reported.  (D.E. 12-7, Pages 83 and 85).

On December 20, 2011, Plaintiff underwent a psychiatric consultation.  (D.E. 12-13, Page 4).  Plaintiff reported her twenty year old son was living with her and her husband and her daughter was in the U.S. Coast Guard stationed at Port O'Connor, Texas.  (D.E. 12-13, Page 4).  Plaintiff also reported the attempted sexual assault during her time in the military, her fear of closed in places and people grabbing her and coming up from behind, and large men.  (D.E. 12-13, Page 4).  Plaintiff again recounted about a young man walking up behind her on a beach and how "she reacted by back-handing him before she could stop herself."  (D.E. 12-13, Page 5).  Plaintiff is also noted as "Denies any previous sexual trauma."  (D.E. 12-13, Page 5).  Plaintiff further reported she had been having "fainting spells" for about six months and short term memory problems for the past nine months, possibly as a result of anxiety or a side effect of her medications.  (D.E. 12-13, Page 5).  Plaintiff is noted as being polite with euthymic mood and congruent affect, thought processes were logical and goal directed, judgment and insight were intact, and speech was normal.  (D.E. 12-3, Page 5).  Plaintiff was assessed as having "PTSD secondary to MST with free floating anxiety, hypervigilance, insomnia, difficulty with reminders, phobias, and severe startle."  (D.E. 12-13, Page 5).

On January 5, 2012, Plaintiff's MRI of her brain taken due to her syncopal episodes was found to have "[n]o significant abnormality identified."  (D.E. 12-13, Pages 19 and 50-51).  Plaintiff's brain MRI and EEG are noted as "unremarkable."  (D.E. 12-

13, Page 57).  The same day, Plaintiff's MRI of her left shoulder taken due to her complaints of chronic pain was found to have "…no osseous, articular or soft tissue abnormalities" and the overall impression was "negative examination."  (D.E. 12-13, Page 21).

On February 23, 2012, Plaintiff reported her medication was helping her sleep better and this helped her cope with fibromyalgia.  (D.E. 12-13, Pages 47-48).  Plaintiff recounted an incident where one her sons playfully pinned her down in a wrestling hold and she reacted with severe panic, urinating on herself.  (D.E. 12-13, Page 47).  Plaintiff was assessed as having PTSD from her MST and fibromyalgia.  (D.E. 12-13, Page 48 and 56).

On March 5, 2012, the SSA reported Plaintiff's mother-in-law made contact alleging Plaintiff was not disabled and walked over five miles a day on the beach.  (D.E. 12-7, Page 91).

On April 9, 2012, Plaintiff reported generalized pain of six out of ten with moderate relief from her pain medication.  (D.E. 12-13, Page 43).  Plaintiff stated she had blurred vision and had lost consciousness last week for approximately one minute and her husband found her lying on the kitchen floor.  (D.E. 12-13, Page 43).

On May 9, 2012, Plaintiff's chief complaint was chronic pain throughout her body.  (D.E. 12-13, Page 39).  Plaintiff reported her pain as seven out of ten and her medication was helping with the pain so she was sleeping better at night.  (D.E. 12-13, Pages 34-35).  Plaintiff reported she was having fainting spells once monthly when her pain was severe and this had been occurring for the past year and a half.  (D.E. 12-13,

Page 35).  Plaintiff reported her medication made her drowsy when taken in the morning so it was adjusted to a larger dose to be taken only at night.  (D.E. 12-13, Page 35).  Plaintiff further reported she was having several migraines a week after her migraine medication dosage was reduced to 100 mg daily.  (D.E. 12-13, Page 36).  Her medication was increased back to 150 mg daily.  (D.E. 12-13, Page 36).  Plaintiff's chronic pain level is noted as intolerable.  (D.E. 12-13, Page 39).

On May 23, 2012, Plaintiff reported she had traveled to Maine for her service-connected disability interview, was found to be 50% disabled for her service-connected MST, and now felt more validated.  (D.E. 12-13, Page 28).  Plaintiff further reported a stable mood, sleeping well and that she was tolerating her medications well.  (D.E. 12-13, Page 28).  Plaintiff stated she and her husband had volunteered for Wounded Warriors weekend.  (D.E. 12-13, Page 28).  Plaintiff was found to have anxiety nos secondary to MST and "currently stable on meds and functioning well with family."  (D.E. 12-13, Page 29).  Plaintiff underwent an EEG because of her reported recurrent fainting episodes and severe fibromyalgia pain.  (D.E. 12-13, Page 31).  Plaintiff's EEG was normal.  (D.E. 12-13, Page 32).

On July 10, 2012, Plaintiff reported having nosebleeds every morning since starting new medications in April and May 2012 and was also having migraines more frequently.  (D.E. 12-13, Pages 23-24 and 25).  Plaintiff was advised to stop taking one medication and to update on improving or persisting symptoms.  (D.E. 12-13, Page 24).  Plaintiff reported her pain level at seven out of ten and her chronic pain level is listed as

"acceptable level." (D.E. 12-13, Page 25). Plaintiff is noted as well developed, well nourished, and ambulatory. (D.E. 12-13, Page 24).

On July 20, 2012, Plaintiff stated she had recently been having more headaches as wells almost daily nosebleeds. (D.E. 12-13, Page 77). Plaintiff stated her pain level was seven out of ten and her chronic pain level is noted as tolerable. (D.E. 12-13, Page 77).

On July 30, 2012, Plaintiff reported she had two types of headaches: "regular headaches" which were mild and responded to aspirin and migraines which were exclusively right sided and were severe and disabling. (D.E. 12-13, Page 59). Plaintiff further stated since taking preventative migraine medication, the frequency had been reduced from once a week to once a month. (D.E. 12-13, Page 59). Plaintiff is noted as living with her husband. (D.E. 12-13, Page 60). Plaintiff was assessed as having "classic migraine, which is well-controlled on her present medication." (D.E. 12-13, Page 61). Plaintiff attributed her blackout episodes to her "system shutting down" from excessive pain. (D.E. 12-13, Page 61).

On October 3, 2012, a hearing was held before an ALJ at which Plaintiff and a VE testified. (D.E. 12-3, Pages 102-135). Plaintiff testified she was living with her husband and her daughter. (D.E. 12-3, Page 110). Plaintiff further testified she was able to drive only when she did not take her medication which made her drowsy. (D.E. 12-3, Page 110). Plaintiff stated she did not "have anybody else to drive all the time" because her daughter was at work and she had a disabled husband who did not drive. (D.E. 12-3, Page 110). Plaintiff stated she would "normally stay close to home" which she described as about two miles to get groceries. (D.E. 12-3, Page 110). Plaintiff indicated she drove

to the hearing, which was approximately nine miles from home, because her daughter was at work and she had not taken her pain medication to avoid becoming drowsy. (D.E. 12-3, Pages 110-111 and 116). Plaintiff testified she received an associate's degree in 2009 after going to school full time. (D.E. 12-3, Page 112). Plaintiff testified she could not work full time because she was "in pain all the time" and all of her medications made her drowsy so she slept during the day. (D.E. 12-3, Page 115). Plaintiff reported pain of six to seven out of ten throughout her entire body, worse in her arms, hand, hips and legs and made worse by not taking her medications, activity and bad weather. (D.E. 12-3, Pages 115-117). Plaintiff stated she could walk a half a mile, stand up for ten to fifteen minutes before having to sit down, and sit for about twenty to twenty-five minutes before having to stand. (D.E. 12-3, Page 118). Plaintiff testified she could bend at the waist and pick up a pencil from the floor, could squat with pain, could lift and carry ten pounds, was forgetful and had to write things down, and had a short memory and attention span. (D.E. 12-3, Pages 118-119). Plaintiff also testified she did not like to be around crowds of two or more people and had severe anxiety when dealing with strangers. (D.E. 12-3, Pages 120-121). Plaintiff stated she had headaches a couple of times per week and migraines "at least four or five times a month" which lasted for one day if she took her medication right away and two days if she did not. (D.E. 12-3, Page 124). Plaintiff further stated she had not had a black out in a while and that her neurologist was still investigating the cause. (D.E. 12-3, Page 124). Plaintiff testified she slept after taking medication, was able to take care of her own personal hygiene, performed household chores included sweeping and dusting, did not perform yard work, could microwave food

but no longer cooked from scratch, took a one hour nap every afternoon, and had her daughter do the laundry and the grocery shopping.  (D.E. 12-3, Pages 126-127).  Plaintiff stated while she accompanied her husband to all his doctors' appointments, her daughter drove.  (D.E. 12-3, Page 128).  Plaintiff also stated the treatment note indicating she took a six week trip to Texas and the Bahamas in March 2011 was incorrect and that it was her husband and his sister who went to the Bahamas.  (D.E. 12-3, Page 128).  Plaintiff then testified that she went to Texas and her "husband ended up not even going to the Bahamas either that time."  (D.E. 12-3, Page 129).

The VE testified Plaintiff's past work as a shoe stitcher was medium level as she performed it because of the weight of the boxes of shoes Plaintiff stated she was required to lift.  (D.E. 12-3, Page 130).  The VE then testified that someone of Plaintiff's age, education and vocational history who could lift and/or carry 10 pounds frequently, 20 pounds occasionally, stand and/or walk six hours in an eight-hour day, sit for six hours in an eight-hour day, could not climb ropes, ladders or scaffolds or work at unprotected heights or around dangerous, moving machinery, could occasionally stoop, kneel, crouch, crawl and balance and could have occasional contact with the general public would not be able to perform Plaintiff's past relevant work as a shoe stitcher as Plaintiff performed it because it was medium level work but would be able to perform it as set out in the Dictionary of Occupational Titles ("DOT") where it was defined as light level work.  (D.E. 12-3, Page 130-133).  The VE also testified that someone of Plaintiff's age, education and vocational history who could lift and/or carry 10 pounds frequently, 10 pounds occasionally, stand and/or walk two hours in an eight-hour day, sit for six hours

in an eight-hour day, could not climb ropes, ladders or scaffolds or work at unprotected heights or around dangerous, moving machinery, could occasionally stoop, kneel, crouch, crawl and balance and could have occasional contact with the general public would not be able to perform Plaintiff's past relevant work but would be able to perform work as a lens inserter, bench hand, and hand packager which are classified as sedentary, unskilled. (D.E. 12-3, Pages 133-134).   The VE testified that all the positions described above existed in significant numbers in the nation and region.  (D.E. 12-3, Pages 133-134).  The VE further testified there would be no jobs available to a person who could not work eight hours per day.  (D.E. 12-3, Page 135).

On October 21, 2013, Plaintiff reported her fibromyalgia was aggravated in cold and humid weather and caused her constant pain.  (D.E. 12-3, Pages 51 and 55).  Plaintiff further stated she had throbbing knee pain.  (D.E. 12-3, Page 51 and 55).  Plaintiff reported she exercises by walking, her pain was a six out of ten, her chronic pain level was unacceptable, and she had "soreness all over her body." (D.E. 12-3, Pages 52 and 56).  Plaintiff is noted as having "all trigger points sensitive."  (D.E. 12-3, Page 53). Plaintiff's fibromyalgia is noted as "stable" on her current medication.  (D.E. 12-3, Page 54).

At an appointment on October 23, 2013, an x-ray of Plaintiff's right knee taken as a response to Plaintiff's complaints of right knee pain found "no osseous, articular or soft tissue abnormalities and the impression was "negative examination."  (D.E. 12-3, Page 17, 2013).

On November 20, 2013, Plaintiff reported she lived at home and had a hobby of playing bingo.  (D.E. 12-3, Page 40).  Plaintiff is noted as being a "[w]ell developed well nourished lady with appropriate dress, demeanor, mood, affect and grooming" and ambulatory.  (D.E. 12-3, Pages 41 and 45).  Plaintiff's pain score is noted as 1 and chronic pain is listed as acceptable.  (D.E. 12-3, Pages 41 and 46).  The record further states, "Patient c/o general pain that is treated with medication."  (D.E. 12-3, Page 45).

On November 22, 2013, Plaintiff's chief complaint was right knee pain which Plaintiff described as throbbing and radiating from her knee down the front of her leg, made worse by lying down and straightening her leg.  (D.E. 12-3, Page 35).  Plaintiff is noted as "has fibromyalgia" and "is not active and recalls no injury.  (D.E. 12-3, Page 35).  Plaintiff assessed her level of pain as 3.  (D.E. 12-3, Page 36).

On February 20, 2013, Plaintiff reported her combination of medication for the last four years has been effective in treating both her PTSD and fibromyalgia.  (D.E. 12-3, Page 75).  Plaintiff further reported "her medications have been very helpful overall." (D.E. 12-3, Page 75).  Plaintiff's main complaint was her medication made her sleep a lot and "while she has benefited, she would like to try to reduce or change her medication so that she will be more functional during the day."  (D.E. 12-3, Page 75).  Plaintiff reported she had no depressive or anxiety symptoms and her PTSD had "not been troubling her." (D.E. 12-3, Pages 76-77).  Plaintiff further reported no cognitive issues.  (D.E. 12-3, Page 77).  Plaintiff is noted as relaxed and pleasant, with normal intellectual functioning and good insight, judgment and reliability.  (D.E. 12-3, Page 77).  Plaintiff's PTSD is noted as "stable."  (D.E. 12-3, Page 77).  Plaintiff's medications were adjusted and it was

recommended Plaintiff participate in supportive and cognitive behavioral therapy.  (D.E. 12-3, Pages 78-79).

On March 19, 2013, Plaintiff reported her medication to assist with her sleep was sedating in the morning, causing her difficulty with morning activities, so a reduced half dose was recommended.  (D.E. 12-3, Page 73).  Plaintiff further reported no other adverse side effects to this medication.  (D.E. 12-3, Page 73).

On April 9, 2013, Plaintiff reported her fibromyalgia has increased pain in cold and humid weather, her need for medication had increased, she exercised by walking and had starting going to the gym but had stopped.  (D.E. 12-3, Pages 66 and 68).  Plaintiff is noted as having "all trigger points sensitive."  (D.E. 12-3, Page 68).  Plaintiff also denied she was in any pain and listed her level of pain at 0.  (D.E. 12-3, Page 72).

On May 8, 2013, Plaintiff reported her pain was a six out of ten and her chronic pain was unacceptable.  (D.E. 12-3, Page 60).  Plaintiff reported aching, constant pain caused by her fibromyalgia.  (D.E. 12-3, Page 60).

## IV.  STANDARD OF LAW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance. *Leggett v. Chater*, 67

F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## V.  DISCUSSION

## A.    ALJ's Determination

In the December 7, 2012 decision, the ALJ followed the five-step sequential process determining that at step one, Plaintiff had not engaged in substantial gainful activity since January 1, 2010, the amended alleged onset date.  (D.E. 12-3, Page 91).  At step two, the ALJ found that Plaintiff's severe impairments included obesity, headaches, fibromyalgia, hypertension, post-traumatic stress disorder, anxiety, and depression.  (D.E. 12-3, Page 91).  The ALJ also determined Plaintiff's status/post right shoulder surgery and left foot surgery were non-severe and were not limiting at any time since the alleged onset date.  (D.E. 12-3, Page 92).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity one of the listed impairments under the regulations and Plaintiff had the RFC to perform a modified range of light work.  (D.E. 12-3, Pages 92-93).  At step four, the ALJ found that Plaintiff could perform her past relevant work as a shoe stitcher as general performed based upon the testimony of the VE.  (D.E. 12-3, Page 96).  The ALJ concluded Plaintiff had not been under a disability from January 1, 2010 through the date of the decision. (D.E. 12-3, Page 97).

## B.    Issues Presented

Specifically, Plaintiff raises these issues: (1) the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to consider and weigh all the evidence in the record as Plaintiff's fibromyalgia, headaches and PTSD caused significantly more limitations in Plaintiff's ability to perform work related activities; (2) the ALJ erred by not appointing a medical expert to perform a consultative examination

or to testify as to Plaintiff's limitations at the administrative hearing; and (3) the ALJ's credibility determination was improper.  (D.E. 14, Pages 4-25).  For the reasons stated below, the undersigned finds Plaintiff's claims are without merit and substantial evidence supports the ALJ's decision.

### 1.    RFC

An individual claiming disability has the burden of proving disability and must prove the inability to engage in any substantial gainful activity.  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)(citations omitted).  "The mere presence of some impairment is not disabling per se.  Plaintiff must show that she was so functionally impaired by her [disability] that she was precluded from engaging in any substantial gainful activity.  *Id.*(citations omitted).

The RFC is an assessment, based on all of the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  RFC refers to the most a claimant is able to do despite physical and mental limitations.  20 C.F.R. § 404.1545(a).  The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence.  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.")(citation omitted).

Here, the ALJ performed a thorough analysis of Plaintiff's conditions based on the objective medical evidence, which indicated that while Plaintiff had some physical and mental limitations, they responded to treatment.  (D.E. 12-3, Pages 92-96).  As a result, the ALJ concluded Plaintiff had the RFC to perform a modified range of light work.  (D.E. 12-3, Page 93).  Specifically, the ALJ found Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, could occasionally balance, stoop, kneel, crouch, or crawl and could never climb ladders, ropes, or scaffolds or work at unprotected heights or around dangerous moving machinery, and must have only occasional contact with the public.  (D.E. 12-3, Page 93).

Plaintiff asserts the evidence in the record supports a determination that Plaintiff is more limited than the ALJ found as a result of her fibromyalgia, headaches, and PTSD.  (D.E. 14, Page 5).  Specifically, Plaintiff asserts "the ALJ's analysis of the evidence was incomplete and the ALJ erred by picking and choosing the evidence most favorable to his final disability determination" ignoring records.  (D.E. 14, Pages 12 and 16).  Plaintiff asserts the ALJ ignored treatment notes regarding her fibromyalgia points, regarding her fibromyalgia pain, and her testimony and treatment notes regarding her daily activity limitations.

The undersigned notes an ALJ is not required to explicitly discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation.  *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994)("That [the ALJ] did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that

this process is designed to ensure."); *See also Castillo v. Barnhart*, 151 F.App'x 334, 335 (5th Cir. 2005)(per curium)("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence.")(citation omitted); *See also Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005)("[An] ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it," and "there is no statutorily or judicially imposed obligation for the ALJ to list explicitly all the evidence he takes into account in making his findings…")(citation omitted).

The ALJ did not find that Plaintiff did not have fibromyalgia, headaches, or PTSD, instead finding them to be severe impairments.  Rather, the ALJ found the degree of impairment evidenced by the objective medical findings and the treatment record did not impose functional restrictions of disability severity on Plaintiff's activities.  Further, the ALJ referenced treatment notes regarding Plaintiff's ailments which indicated they were improving.  (D.E. 12-3, Pages 92-96).  The ALJ also noted that in spite of her ailments, Plaintiff is consistently reported as the primary caregiver for his disabled husband as well as a grandchild and no treating, examining, or evaluating physician had indicated that Plaintiff was unable or was expected to be unable to work for twelve consecutive months. *Castillo*, 151 Fed. App'x at 335.  Further, the ALJ reviewed Plaintiff's reported daily activities which included sweeping and dusting, preparing meals but not from scratch, doing laundry, playing bingo, driving to the grocery store and grocery shopping.  (D.E. 12-3, Pages 110 and 126-127; D.E. 12-7, Pages 27-29 and 67-69; D.E. 12-12, Page 71; D.E. 12-13, Pages 12-13; D.E. 12-13, Page 28).

Upon reviewing the record, it is clear Plaintiff's symptoms did improve with treatment and her complaints as to the severity and varying effects of her ailments are not supported by her reports of daily activities.  For example, in February 2010, Plaintiff reported "total body aches," feeling depressed, four migraines a month and chronic daily headaches.  (D.E. 12-8, Page 108-109).   However, at the same time, Plaintiff also reported she performed most of the household chores because she had "to look after the family."  (D.E. 12-8, Page 110).  By April 2010, Plaintiff is noted as having infrequent migraines and after being prescribed daily migraine preventative medication in July 2010, the record demonstrates Plaintiff reported having little to no migraines from then on, consistently reporting her migraine medication was a "miracle pill."  (D.E. 12-8, Pages 40, 45, 49, 56, 66-67, D.E. 12-9, Pages 96-97, D.E. 12-11, Pages 72 and 92).[3]  In July 2012, Plaintiff was assessed as having "classic migraine, which is well-controlled on her present medication."  (D.E. 12-13, Page 61).

In April 2011, Plaintiff is noted as "probably has residual PTSD" from her MST, her PTSD screening in November 2011 was negative and by February 2013, Plaintiff reported she her PTSD had "not been troubling her" and her PTSD is noted as "stable." (D.E. 12-3, Page 77; D.E. 12-11, Page 112; and D.E. 12-13, Pages 9-10)

---

[3] On May 9, 2012, Plaintiff reported having several migraines a week after her migraine medication dosage was reduced to 100 mg daily.  (D.E. 12-13, Page 36).  Her medications was increased back to 150mg daily by May 23, 2012, Plaintiff was reported as "currently stable on meds" and her migraines were on average once a month by July 30, 2012.  (D.E. 12-13, Pages 29 and 59).  While Plaintiff reported at the October 3, 2012, hearing that she had migraines "at least four or five times a month" her records, as detailed above, do not support this assertion.

In April 2010, Plaintiff was assessed as having "tenderness to touch all over fibromyalgia points as well as non-fibromylagia points." (D.E 12-8, Page 14). In May 2010, Plaintiff's fibromyalgia symptoms are noted as "doing better" with treatment and having "mild improvement." (D.E. 12-8, Pages 80-81). While Plaintiff reported constant pain in July 2010, Plaintiff is consistently noted as being the primary caregiver for her disabled husband who suffered from a chronic seizure disorder at all times relevant to her disability determination and one of her grandchildren during part of the relevant time. (D.E. 12-3, Pages 41, 45, 77, 110, 111, and 116; D.E. 12-13, Page 24; D.E. 12-7, Page 26; D.E. 12-8, Pages 6, 13, 17, 18, 40, 41, 50, 53, 66-67, 95, 96, and 110). Further, Plaintiff is also consistently noted as pleasant, articulate, moving fluidly, ambulatory, interactive, energetic and, other than Plaintiff's complaints of mild memory deficiencies, having no cognitive deficiencies, having problems with large crowds, and to be independent with activities of daily living. (D.E. 12-13, Pages 5 and 75-77; D.E. 12-8, Pages 6, 70, 72, 77, 81, 97, and 111). By November 2010, Plaintiff reported her fibromyalgia was "overall better when more active" and while her fibromyalgia pain had gotten worse as of February 2011, by May 2011, Plaintiff reported her fibromyalgia medication was effective and she took a six week trip to Texas and by November 2011, Plaintiff reported her chronic pain level was acceptable. (D.E. 12-3, Page 128, D.E. 12-7, Page 59, D.E. 12-8, Pages 45, D.E. 12-11, Page 99 and D.E. 12-13, Pages 12-13).

On May 9, 2012, Plaintiff reported her chronic pain as intolerable but by May 23, 2012, Plaintiff reported she was sleeping and tolerating her medications well and was noted as "currently stable on meds and functioning well with family." (D.E. 12-13, Pages

28 and 39).   In July 2012, Plaintiff's chronic pain level is listed as tolerable and by November 20, 2013, Plaintiff reported her chronic pain as acceptable and noted her pain score as 1 out of 10.  (D.E. 12-13, Page 25 and 77; D.E. 12-3, Pages 41 and 46).   On November 22, 2013, Plaintiff reported her pain level as three out of ten and in February 2013, Plaintiff reported her combination of medication for the last four years had been effective in treating both her PTSD and fibromyalgia. (D.E. 12-3, Pages 36 and 75). Further, while Plaintiff is noted as having "all trigger points sensitive" in April 2013, Plaintiff denied any pain and listed her pain level at 0.  (D.E. 12-3, Page 72).

Given the above, the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

## 2.      Consultative Examination or Testimony from a Medical Expert

Plaintiff also asserts the ALJ erred "in coming to his conclusions about Plaintiff's disability [because he] did not rely upon any opinion evidence from a treating or examining physician, as none existed in the record, nor did he request a consultative examination or testimony from a medical expert at the administrative hearing." (D.E. 14, Pages 12-13).  Without this testimony, Plaintiff asserts the ALJ simply expressed his own opinion about the medical issues in this case and is not permitted to do so.

The Fifth Circuit has held the absence of a medical source statement about a plaintiff's ability to work does not, by itself, make the record incomplete.  *Ripley v. Charter*, 67 F.3d 552, 557 (5th Cir. 1995).   Instead, the issue is whether substantial evidence exists in the record to support the ALJ's decision.  *Id*.  "The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed

decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)(citation omitted). "Generally, however, the duty to obtain medical records is on the claimant." *Gonzalez v. Barnhart*, 51 Fed. App'x 484 (5th Cir. 2002)(the ALJ, who made numerous inquiries regarding [claimant's] medical condition and employment history, did not fail to develop the record by not ordering a consultative examination and a consultative examination was not necessary to enable the ALJ to make a disability determination).

In this case, there were no treating physician's opinions concerning whether Plaintiff's medical conditions limited or impaired her ability to engage in work related activities. Plaintiff points to no evidence that she requested a consultative examination at any point during the claims process. Further, Plaintiff's counsel did not request a consultative examination or any expert testimony at the administrative hearing.

Upon review, the ALJ's determination of Plaintiff's RFC is based on substantial evidence even without such a medical opinion. The ALJ properly evaluated Plaintiff's impairments and the completeness of the record before determining Plaintiff's RFC. All of Plaintiff's ailments and resulting limitations are discussed throughout Plaintiff's extensive treatment records. The ALJ, who questioned the Plaintiff at length, observed her during the hearing, and thoroughly reviewed her treatment records, was not required to order a consultative examination or additional medical testimony in order to make a disability determination. The ALJ based his determination in part on Plaintiff's own reports and testimony regarding her ability to perform certain tasks despite having claims of physical and mental limitations as well as the medical evidence that demonstrated

improvement in her conditions.  The ALJ possessed evidence to fully and fairly develop the record, noting the inconsistencies between Plaintiff's testimony and the medical reports obtained reflecting her ability to conduct daily tasks.  Additionally, the ALJ possessed evidence indicating the lack of any neurological deficits to explain certain alleged medical symptoms relating to Plaintiff's limitations.  (D.E.12-13, Pages 17, 21, 32, and 57).  Lastly, the ALJ noted that his opinion was consistent with the opinions at the initial and reconsideration levels.  (D.E. 12-3, Page 96).

Further, to obtain a remand for an ALJ's failure to develop the record, Plaintiff must demonstrate she was prejudiced by the deficiencies she alleges.  *Brock*, 84 F.3d at 728 (explaining Plaintiff "must show that he could and would have adduced evidence that might have altered the result")(citation omitted).  Plaintiff has failed to make a sufficient showing of prejudice and points to no sufficient evidence that, had the ALJ developed the record further, would have been offered at the hearing and changed the result.  Plaintiff has not offered any evidence of prejudice.  The ALJ conducted a review of the entire record and used this information to determine Plaintiff's RFC.  The ALJ did not have a duty to request consultative examinations when the record already contained substantial evidence upon which to make a determination.

### 3.    Credibility

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).  Subjective complaints must be corroborated, at least in part, by objective medical findings.  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988)(citations

omitted); *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985); *Chambliss*, 269 F.3d at 522.   For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522.   An ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *Dunbar v. Barnahrt*, 330 F.3d 670, 672 (5th Cir. 2003)(*citing Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

An ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking.   Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. § 404.1529(c)(3).

The ALJ properly cited, *inter alia*, Social Security Ruling 96-7P[4] and the two part test for evaluating Plaintiff's credibility.   (D.E. 12-3, Pages 93-96).   The ALJ then summarized Plaintiff's hearing testimony and, after consideration of all the evidence, determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's allegations regarding the intensity,

---

[4] SSR 96-7P states that an ALJ must first consider whether there is an underlying medically determinable impairment that could reasonably be expected to produce the individual's pain or other symptoms.  The ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's abilities to do basic work activities.  If the individual's statements are not substantiated by objective medical evidence, the ALJ determines credibility considering the record as a whole.  Statements about symptoms and pain are not rejected solely due to lack of evidence and other factors, such as activities of daily living, medication dosage and side effects, and treatment and methods of alleviating pain should be considered.  Lastly, the ALJ's credibility determination must be grounded in evidence and must be specifically articulated in the determination.

persistence and limiting effects of these symptoms were not credible. (D.E. 12-3, Page 96).

While Plaintiff acknowledges the ALJ complied with regulations and SSR 96-7p, she asserts the statements supporting the ALJ's determination are unsupported as Plaintiff's husband is more mentally disabled rather than physically disabled, her daughter assists with the activities of daily living, Plaintiff's poor work history was due to her low self-esteem and pain associated with physical contact due to her fibromyalgia, and there was no evidence to support Plaintiff's mother-in-law's March 2012 statement regarding Plaintiff walking over five miles a day on the beach.  (D.E. 14, Page 24).

Upon review, the ALJ properly considered Plaintiff's subjective complaints of pain.  While pain alone can be disabling, the pain must be constant, unremitting and wholly unresponsive to therapeutic treatment to be recognized as disabling under the Act. *Hames*, 707 F.2d at 166(citations omitted).  The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort.  *Id.* "Plaintiff must show that she is so functionally impaired that she is precluded from engaging in substantial gainful activity." *Id.*  For the reasons previously discussed, Plaintiff has failed to do so.

In terms of Plaintiff's mental health issues, the ALJ's finding that Plaintiff could perform light work with some modifications also is supported by substantial evidence. The ALJ found Plaintiff suffers from the severe impairments of obesity, headaches, fibromyalgia, hypertension, PTSD, anxiety and depression and, as a result, is mildly restricted in her activities of daily living, moderately restricted with social functioning

and mildly restricted with maintaining persistence, concentration and pace.  (D.E. 12-3, Pages 91-93).   Plaintiff asserts the record does not support the ALJ's finding that Plaintiff's mental RFC allowed occasional contact with the public.  (D.E. 14, Page 21).  Plaintiff maintains Plaintiff's psychiatric treatment notes and her hearing testimony indicate Plaintiff is much more mentally restricted, specifically as to her ability to interact with strangers, especially men, and in crowds.  (D.E. 14, Page 21).   Plaintiff also maintains the record supports that Plaintiff had more than mild difficulties maintaining concentration, persistence or pace as her medications required to her to nap, prohibited her from driving and caused her to have memory problems associated with a short memory span.

There are inconsistencies in the record regarding the extent of Plaintiff's physical and mental limitations and her performance of daily activities, as described above, and the ALJ properly weighed this evidence before reaching a credibility determination.  As discussed above, Plaintiff's ailments were responsive and improved with treatment.  Further, in spite of her allegations of issues with concentration, persistence or pace, Plaintiff, as discussed above, was found to be able to function independently and to have no cognitive deficiencies.

Further, the ALJ, considering Plaintiff's testimony regarding PTSD symptoms, properly restricted Plaintiff's RFC to include only occasional contact with the public. (D.E. 12-3, Page 93).  This is supported by substantial evidence as the record indicates Plaintiff was consistently noted as interactive and pleasant, was able to care for both her husband and a grandchild, and travel to both Maine and Texas.  (D.E. 12-7, Pages 27-29;

12-8, Page 97; D.E. 12-11, Page 69; D.E. 12-13, Page 28).  Further, by February 2013, Plaintiff reported she her PTSD had "not been troubling her" and her PTSD is noted as "stable." (D.E. 12-3, Page 77; D.E. 12-11, Page 112; and D.E. 12-13, Pages 9-10). Plaintiff also reported her combination of medication for the last four years had been effective in treating both her PTSD.  (D.E. 12-3, Page 75).

## VI.  RECOMMENDATION

For the reasons stated above, it is respectfully recommended that the Commissioner's determination be **AFFIRMED** and Plaintiff's cause of action be **DISMISSED**.

Respectfully submitted this 19th day of August, 2015.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).